IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

VICTOR AGUIRRE, an individual;

    Plaintiff,

v.

MARRIOTT VACATIONS WORLDWIDE CORP., a corporation; and
VISTANA COLORADO MANAGEMENT, INC., a corporation,

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff, by and through his attorney Benjamin DeGolia of DEGOLIA LAW P.C., alleges as follows:

### INTRODUCTION

1. This is a suit brought by a former employee of Defendants Vistana Colorado Management, Inc., and Marriott Vacations Worldwide Corp., who, after fourteen years of satisfactory employment, was prohibited from taking medical leave for chemotherapy treatment and recovery, and just a few months later was terminated after contracting COVID-19.

2. In or around December 2021, Victor Aguirre was diagnosed with esophageal cancer. Between February and May 2022, Mr. Aguirre repeatedly asked his manager for a flexible schedule to work around his chemotherapy treatment, including additional days off to recover from chemotherapy sessions. Theses requests were denied without justification.

1

3. On June 13, 2022, Mr. Aguirre's husband tested positive for COVID-19. Mr. Aguirre advised his supervisor but indicated that he still felt healthy and planned to come to work. On June 14, 2022, Mr. Aguirre awoke up in the middle of the night with a sore throat and a fever, and sent his supervisor numerous text messages advising him that he was unwell. Mr. Aguirre was granted six days of medical leave. Upon returning to work on the seventh day, Mr. Aguirre was informed that he was being terminated. The sole reason given for his termination is that the manner in which he informed his supervisor of his illness at 3am on June 14th—via text message instead of a phone call—violated company policy.

4. Mr. Aguirre brings claims under the Colorado Healthy Families and Workplaces Act ("HFWA"),[1] C.R.S. §§ 8-13.3-401 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and Colorado common law.

**PARTIES**

5. At all times relevant to the subject matter of this action, Plaintiff Victor Aguirre has been a resident of and domiciled in the State of Colorado.

6. Defendant Vistana Colorado Management, Inc. ("Vistana") is a foreign corporation with its principal place of business in Orlando, Florida.

7. Defendant Marriott Vacations Worldwide Corp. is a foreign corporation with its principal place of business in Lakeland, Florida.

8. At all times relevant, Plaintiff was Defendants' "employee" as that term is defined by 29 U.S.C. § 2611 and C.R.S. § 8-13.3-402.

---

[1] As indicated below, Mr. Aguirre is in the process of exhausting his HFWA claims, and intends to amend his complaint in short order to add these claims.

2

9. At all times relevant, Defendants were Plaintiff's employers as that term is defined by 29 U.S.C. § 2611 and C.R.S. § 8-13.3-402.

10. Plaintiff was employed by Defendants at the Sheraton Mountain Vista Villas in Avon, Colorado (hereinafter "Sheraton"), which is jointly owned and managed by Defendants Vistana and Marriott.

## JURISDICTION AND VENUE

11. This action arises under the laws of the United States and the State of Colorado and is brought pursuant to the 29 U.S.C §§ 2901 *et seq.*, C.R.S. §§ 8-13.3-401 *et seq.*, and Colorado common law.

12. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1367.

13. This Court has jurisdiction over Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

14. This Court has jurisdiction over Plaintiff's claims for attorneys' fees and costs pursuant to 29 U.S.C. § 2617 and C.R.S. § 8-13.3-411.

15. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All the events and omissions alleged herein occurred within the State of Colorado.

## ADMINISTRATIVE EXHAUSTION

16. On June 12, 2024, Mr. Aguirre sent a statutory demand pursuant to C.R.S. § 8-13.3-411.

17. It is not clear whether the exhaustion provision set forth in C.R.S. § 8-13.3-411 applies to retaliation claims under C.R.S § 8-13.3-407; section 411 cites to C.R.S. § 8-4-109, the provision of the Colorado Wage Act that governs statutory demands for unpaid wages.

18. Mr. Aguirre does not bring a statutory claim for unpaid wages.

19. Nonetheless, out of an abundance of caution, Mr. Aguirre sent the statutory demand pursuant to C.R.S. § 8-13.3-411 on June 12, 2024. Mr. Aguirre will amend his Complaint to add claims pursuant to C.R.S. § 8-13.3-407 after the expiration on fourteen days from Defendants' receipt of his statutory demand as set forth in C.R.S. § 8-13.3-411.

## FACTUAL ALLEGATIONS

### Victor Aguirre's Employment at Sheraton Mountain Vista Villas

20. Victor Aguirre is a naturalized United States citizen of Mexican descent.

21. Mr. Aguirre has limited English proficiency. He is able to speak enough English to get by, but he often makes mistakes.

22. Mr. Aguirre is not a proficient reader of English.

23. Mr. Aguirre was hired to work for Vistana Colorado Management Inc. and Marriott Vacations Worldwide Corp. at their Sheraton Mountain Vista Villas in or around 2009.

24. During his time working for Defendants, Mr. Aguirre was routinely praised for his work. Over the course of nearly fourteen years, Mr. Aguirre received little to no negative performance evaluations.

25. Mr. Aguirre began as a seasonal employee, working at Defendants' Sheraton hotel during the peak winter season before becoming a full-time year-round employee in approximately April 2014.

26. In or around 2016, Mr. Aguirre was promoted to Front Desk Supervisor, a position he held until his termination in June 2022.

27. As Front Desk Supervisor, Mr. Aguirre was charged with all front desk operations, including customer service, check-ins and check-outs, answering phone calls, and generally fielding any customer service issue that arose.

28. Mr. Aguirre was also responsible for training and managing Front Desk personnel, creating the shift schedules for Front Desk and Night Audit personnel, and occasionally also creating the shift schedule for Housekeeping, which included approximately thirty-five housekeepers and five maintenance personnel.

29. Throughout his tenure working for Defendants at their Sheraton hotel, Mr. Aguirre was classified as an hourly employee.

30. At the time of his termination in 2022, Mr. Aguirre earned $23.50 per hour.

31. For the duration of his employment as Front Desk Supervisor, Mr. Aguirre worked approximately 40 hours per week during the off season and 48 hours per week during the high season.

32. For the duration of his employment, Mr. Aguirre lived in an apartment directly across the parking lot from the Sheraton, which was and is owned by Defendants.

33. Despite living in housing owned by Defendants, Plaintiff was still required to pay rent and had a normal leasing agreement with Defendants for his apartment located at 180 W. Beaver Creek Blvd., Apt. 302, Avon, CO 81620.

34. Mr. Aguirre was one of few front desk supervisors, and at times the only front desk supervisor, who lived so close to the hotel.

35. Due to his close proximity to the hotel, Mr. Aguirre was required to be on call at all times in case situations arose in the middle of the night.

36. Because he lived so close, Mr. Aguirre would frequently be called in the middle of the night or on his days off about various situations arising at the hotel.

37. For the same reason, Mr. Aguirre was often the only supervisor available to handle situations in the middle of the night.

38. Mr. Aguirre would frequently come to the hotel in the middle of the night or on his days off to handle such situations.

39. Mr. Aguirre was generally not compensated when he was required to come to the hotel in the middle of the night or on his days off to handle the various tasks described above.

40. Mr. Aguirre was also frequently asked to complete work tasks during the evenings or on his days off. Mr. Aguirre would complete these tasks from home.

41. For example, Mr. Aguirre would be tasked with completing bookings for other hotels, including the Westin, the Westin Residences, and another Sheraton location.

42. Mr. Aguirre would also be tasked with completing inventories for other hotels, and managing the cleaning operation for the event space at the Westin Residences.

43. Mr. Aguirre was also required to complete various marketing-related materials during the evenings or his days off.

44. Mr. Aguirre was generally not compensated when he would be required to complete tasks from home.

45. Throughout his employment as a Front Desk Supervisor, Mr. Aguirre was instructed to manually adjust his hours in the payroll system to reduce any overtime he had worked.

46. In or around December 2021, Defendants hired Jesse Larson to be the Sheraton's General Manager.

47. In April 2022, the Sheraton's Operations Manager, Evan Clingan, informed Mr. Aguirre that he was "doing a very good job," that "[s]upervising and managing are hard, especially with a new team," but that Mr. Aguirre was "handling it well."

48. Mr. Aguirre excelled in his role as Front Desk Supervisor. This is reflected, for example, in the fact that Mr. Aguirre did not receive any negative performance reviews or other performance-related discipline during his tenure as Front Desk Supervisor.

49. By any measure, Mr. Aguirre performed his job satisfactorily.

**Mr. Aguirre is Diagnosed with Cancer in 2021 and Undergoes Chemotherapy**

50. In or around December 2021, Mr. Aguirre was diagnosed with esophageal cancer.

51. Mr. Aguirre's treatment plan included weekly chemotherapy sessions at the University of Colorado Hospital in Aurora.

52. Mr. Aguirre underwent chemotherapy from approximately February 2022 to early May 2022.

53. When Mr. Aguirre learned in or around December 2021 that he had been diagnosed with cancer and that he would have to undergo chemotherapy treatment, he spoke with his supervisor, Front Desk Manager David McCourt.

54. Mr. Aguirre informed Mr. McCourt that he had been diagnosed with cancer and that he would be undergoing weekly chemotherapy treatment in Aurora.

55. Mr. Aguirre requested that he be provided additional days off, and that his days off be scheduled such that he could travel to Aurora for his chemotherapy and have a few days of rest at home in Avon before returning to work each week.

56. In response, Mr. McCourt stated that the hotel was busy and short-staffed, and furthermore that Mr. Aguirre did not have very much sick time remaining for the year, so he would not be able to take additional days beyond his normal two days off per week.

57. Mr. Aguirre responded that he had to put his health first and he had to prioritize his health over the hotel, and again asked Mr. McCourt to allow him additional days off.

7

58. In response, Mr. McCourt stated that he understood, but that the hotel did not have the personnel to accommodate any additional days off.

59. Subsequently, when Mr. Aguirre began treatment, he would advise Mr. McCourt which days he had chemotherapy treatment scheduled and would ask that Mr. McCourt at the very least schedule his two days off to correspond to the day of Mr. Aguirre's chemotherapy treatment appointment and one rest day.

60. On multiple occasions, Mr. McCourt disregarded Mr. Aguirre's requests, scheduling Mr. Aguirre on the days that Mr. Aguirre had informed Mr. McCourt he had chemotherapy appointments.

61. When Mr. Aguirre would confront Mr. McCourt about the schedule and ask him to change the schedule to accommodate Mr. Aguirre's chemotherapy appointments, Mr. McCourt would reply, "the schedule is final."

62. On multiple occasions, Mr. Aguirre was required to ask coworkers to cover his shifts so that he could travel to Aurora for chemotherapy sessions.

63. Mr. Aguirre also was repeatedly precluded from taking days to rest and recover from his chemotherapy sessions, causing significant physical and mental stress.

64. At no time did Mr. McCourt or any other of Defendants' managers inform Mr. Aguirre that he was entitled to leave under the FMLA separate and apart from his sick days.

65. At no time did Mr. McCourt or any other of Defendants' managers indicate that the notice he provided to them regarding his need for medical leave was inadequate and that he needed to provide any additional medical documentation or other certification.

66. Mr. Aguirre finished his chemotherapy treatment in approximately May 2022.

**Mr. Aguirre Tests Positive for COVID-19 and Defendants Terminate Him**

8

67. On June 13, 2022, Mr. Aguirre awoke to a sick husband. Among other things, Mr. Aguirre's husband had a bad cough and a fever.

68. Due to his recent cancer history, COVID-19 presented a significant risk to Mr. Aguirre. As such, Mr. Aguirre was concerned that he could become severely ill if he contracted COVID-19.

69. Mr. Aguirre was off work that day. He called Mr. McCourt and informed him his husband was sick and they suspected it was COVID-19.

70. Later that day, Elmer Aguirre did in fact test positive for COVID-19.

71. Mr. McCourt told Mr. Aguirre that if he had no symptoms, he was okay to come into work, but to let Mr. McCourt know how he was feeling.

72. Mr. Aguirre awoke in the middle of the night feeling very ill.

73. Mr. Aguirre sent text messages to Mr. McCourt at 3:05am telling him that he did not feel well and that he had a fever.

74. Mr. Aguirre sent another text message at 4:13am asking if Mr. McCourt had received his prior messages.

75. Around 6:30am, Mr. Aguirre called the front desk and spoke with Jacqueline ("Jackie") Reyes, a Front Desk Agent. Mr. Aguirre informed Ms. Reyes that he was feeling sick, that he had a fever, and that his husband had tested positive for COVID-19.

76. Mr. Aguirre also understood that the hotel did not have any other employees to cover the front desk. As such, he told Ms. Reyes that he would jump in the shower and head to the hotel.

9

77. Mr. Aguirre was fearful that if he in fact had COVID-19, it could become very serious due to the fact he recently finished cancer treatment and his immune system was severely compromised.

78. Mr. Aguirre also knew that if he did not report to work, he might be terminated. As such, Mr. Aguirre was determined to come to work.

79. Ms. Reyes responded that Mr. McCourt had called her and informed her that Mr. Aguirre was sick and that Mr. McCourt would come to the hotel to cover the front desk.

80. At 7:03am, Mr. McCourt sent Mr. Aguirre a text message stating, "You need to call me when you can't come in. You know this."

81. Mr. McCourt further wrote, "Texting does nothing," and "Jackie tells me you have covid. Is this correct?"

82. Mr. Aguirre apologized, stating "I'm sorry I think u toll me text. I keep on mind text."

83. The intended meaning of Mr. Aguirre's message was that he had been under the impression Mr. McCourt wanted him to send a text message when he was unable to come to work due to illness.

84. Mr. McCourt responded that "[t]hat was never said" and demanded to know whether Mr. Aguirre had COVID-19, stating "that is what you told Jackie."

85. Mr. Aguirre responded, "I have fever and I'm coughing [s]ince last night," that he was "going to get the test today," and that "Elmer got positive yesterday."

86. Mr. McCourt, for some reason jumping to the conclusion that this employee of fourteen years had been dishonest, replied, "Why did you tell Jackie you had it then before being tested?"

87. In response, Mr. Aguirre wrote, "Nooo[.] I didn't say that[.] I told her Elmer has [it]."

88. Mr. McCourt, apparently still believing Mr. Aguirre was lying, responded, "Ok. I'll ask her when I get in."

89. Mr. McCourt then stated that Jesse [Larson], the hotel's General Manager, had asked Mr. Aguirre to complete certain work tasks from home that day.

90. Despite the fact Mr. Aguirre was an hourly employee, was sick, and would not be on the clock, he was being instructed to complete these work tasks from home.

91. Mr. McCourt further wrote that the hotel had some COVID-19 tests and that someone would bring one by Mr. Aguirre's apartment.

92. Approximately one hour later, around 8:00am, June Vigil, the hotel's Rooms Director (with whom Mr. Aguirre had worked for 14 years and who had been his manager the majority of that time), began knocking on Mr. Aguirre's door and calling his phone. Mr. Aguirre answered the phone and informed Ms. Vigil that he was feeling very sick and had not slept all night, in part because he had been trying to get in touch with Mr. McCourt.

93. Mr. Aguirre asked Ms. Vigil to leave the COVID-19 test outside his door.

94. Within 15 minutes, Mr. Aguirre and his husband were again awakened, this time to very loud pounding at their front door.

95. Mr. Aguirre came to the front door, and Mr. McCourt shouted at Mr. Aguirre, demanding that he open the door.

96. Specifically, Mr. McCourt shouted, "I know you're there, open the fucking door! You need to take this covid test right now! I'm not leaving until you open the door!"

11

97. Mr. Aguirre, not knowing what to do, said through the front door that he was naked and he was showering, and that he couldn't open the door. Mr. Aguirre further said that he had the COVID-19 test and he would take it and let Mr. McCourt know about the result.

98. Mr. McCourt said something about not being able to hear the shower running, and again shouted, "Open the fucking door!" and "You're going to take this test right now!"

99. Due to Mr. McCourt's loud pounding and angry shouting, Mr. Aguirre was fearful that if he opened the door, he and Elmer might be assaulted.

100. Elmer was very frightened; Mr. Aguirre assured him that they were safe, and told him to go into the bedroom and lock the door from inside.

101. Mr. Aguirre then responded to Mr. McCourt, telling him that if he did not leave immediately, Mr. Aguirre would call 911. At that point, Mr. McCourt left.

102. After Mr. McCourt left, Mr. Aguirre called Marriott's Human Resources Department and spoke with an HR Manager named Dawn Page, who is based in Arizona.

103. Mr. Aguirre explained that Mr. McCourt had shouted profanities at him through the door and demanded that Mr. Aguirre open the door to take a COVID-19 test in front of him.

104. Ms. Page expressed disbelief that Mr. McCourt had shown up at Mr. Aguirre's home, and stated that Mr. McCourt was wrong to do so.

105. Ms. Page further informed Mr. Aguirre that he was not required to provide a COVID-19 test or any evidence proving that he was positive with COVID-19, and that she would be following up with Mr. McCourt and inform him of such.

106. Around 6pm on June 14, 2022, Mr. Aguirre sent a text message to Mr. McCourt that he had received a positive COVID-19 test. Mr. McCourt responded, "Thank you for letting

12

me know. Sorry I missed your call, I was sleeping. You'll have 5 days. Have you returning Monday. Feel better and let's [sic] us know if you need anything."

107. On June 20, 2022, Mr. Aguirre was still feeling very ill and did not feel well enough to work his 12pm shift. He tried calling Mr. McCourt, and when Mr. McCourt did not answer, he sent a text message stating that he was still "so sick my throat hurt[s] and my nose is running. I will keep you posted."

108. Mr. McCourt responded to Mr. Aguirre's message with "Victor. You need to call me if you can't make it to work. Update me on how you feel tomorrow, but if you cannot make it I expect a call."

109. On June 21, 2022, Mr. Aguirre was feeling somewhat better, and more importantly, he was afraid that if he took any additional sick leave, he might be terminated. As such, he arrived at work for his 12pm shift.

110. Mr. Aguirre was working at his desk when Jesse Larson, the General Manager, asked him to come to his office. In the office, Mr. Larson proceeded to hand Mr. Aguirre some paperwork to sign which indicated that Mr. Aguirre had been suspended without pay from Tuesday, June 14, 2022 until Wednesday, June 22, 2022.

111. Mr. Larson informed Mr. Aguirre that he had not followed the proper call-in procedures by texting Mr. McCourt, and that Mr. Aguirre should have called Mr. McCourt instead.

112. Pursuant to the suspension, Mr. Aguirre was not compensated for the week of June 14th to June 22, 2022.

113. Mr. Aguirre responded that it did not make sense and was not fair that he would be suspended for taking protected medical leave.

114. In response, Mr. Larson simply stated, "you're fired," and instructed Mr. Aguirre to gather his things and turn in his master keys.

115. When walking back to Mr. Aguirre's desk to retrieve the master keys, Mr. Larson informed Mr. Aguirre that he had three (3) days to vacate the apartment he had lived in for fourteen years. Mr. Aguirre inquired as to the short time-frame for vacating the premises when another employee who had been terminated for conduct issues had been given thirty (30) days to vacate.

116. Specifically, Francisco Meza, a maintenance worker, had been terminated for assaulting a young female Front Desk Agent. Mr. Meza was given thirty (30) days to vacate his apartment.

117. In response, Mr. Larson stated that unlike Mr. Meza, Mr. Aguirre—who is a gay man—does not have children, and that as such it should be easy for him to move out within 3 days.

118. The effects of the practices described in the paragraphs above have been to inflict emotional pain, suffering, and inconvenience upon Mr. Aguirre and to deprive him of the financial and other benefits of working for Defendants at their Sheraton Mountain Vista Villas hotel.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Family and Medical Leave Act**
**29 U.S.C. §§ 2601,** *et seq.*
**Interference/Denial of Entitlement**

119. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

120. Plaintiff was at all times relevant to the subject matter of this lawsuit an "eligible employee" of Defendants Vistana Colorado Management Inc. and Marriott Vacations Worldwide Corp. as that term is defined by 29 U.S.C. § 2611.

121. The FMLA prohibits interference. To establish interference an employee must show that: (1) the employee was entitled to sick leave; (2) an adverse action by the employer interfered with the employee's right to take sick leave; and (3) the employer's action was related to the exercise or attempted exercise of the employee's statutory rights.

122. To satisfy the second element of an interference claim, an employee must show that he was prevented from taking the full amount of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take the leave.

123. From approximately February to May 2022, Defendants repeatedly denied Mr. Aguirre's requests for additional days off to recover from his chemotherapy treatment sessions.

124. From approximately February to May 2022, Defendants repeatedly scheduled Mr. Aguirre to work on days that he had already indicated he had chemotherapy treatment sessions, and days following his chemotherapy treatment sessions for which he needed at least one recovery day.

125. Even when confronted with their having scheduled Mr. Aguirre on days that he had previously identified he had chemotherapy treatment sessions or for which he needed a day of recovery, Defendants' agents, and in particular Front Desk Manager David McCourt, simply told Mr. Aguirre that "the schedule is final" and would not be changed.

126. Defendants further preemptively limited Mr. Aguirre's permitted medical leave due to his high-risk COVID-19 infection to five (5) days and required Mr. Aguirre to complete work tasks during his protected medical leave.

127. Finally, Defendants ultimately prohibited Mr. Aguirre from taking any protected medical leave, instead classifying the week he was on medical leave as a suspension.

128. Defendants Vistana and Marriott violated the FMLA when it interfered with Mr. Aguirre's right to sick leave in the manners described above.

129. The unlawful employment practices complained of in the foregoing paragraphs were intentional, and/or carried out with malice or reckless indifference to Mr. Aguirre's protected rights.

130. That Defendants' interference described herein was intentional and/or carried out with reckless indifference to Mr. Aguirre's protected rights is reflected, for example, in Defendants' refusal to adjust Mr. Aguirre's work schedule even after he brought to their attention that he had been scheduled to work on days he identified he required medical leave for cancer treatment and recovery.

131. As a direct and proximate cause of Defendants' interference described herein, Mr. Aguirre has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**SECOND CLAIM FOR RELIEF**
**Family and Medical Leave Act**
**29 U.S.C. §§ 2601,** *et seq.*
**Retaliation**

132. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

133. The FMLA prohibits retaliation.

134. To establish a retaliation claim under the FMLA, an employee must show that: (1) they engaged in a protected activity; (2) the employer took an action that a reasonable employee would have found materially adverse; and (3) there is a casual connection between the protected activity and the adverse action.

135. On Tuesday, June 14, 2022 Mr. Aguirre communicated to Mr. McCourt that he had tested positive for COVID-19. At that time, Mr. McCourt informed Mr. Aguirre that he had five (5) days of sick leave and was scheduled to return to work on Monday, June 20, 2022.

136. On Tuesday, June 21, 2022, Mr. Aguirre was still experiencing COVID-19 symptoms; as such, he communicated to Mr. McCourt that he would not be able to come to work that day.

137. Mr. Aguirre presented to work as scheduled on Wednesday, June 22, 2022. To his surprise, he was informed that instead of being given sick leave, he had been suspended from Tuesday, June 14, 2022 through Tuesday, June 21, 2022.

138. Mr. Aguirre reasonably believed that he qualified for protected medical leave due to his cancer history, which put him at high risk of severe infection due to COVID-19, which could result in the need for extended medical leave.

139. When Mr. Aguirre was informed that he had been suspended during his period of protected medical leave, he expressed opposition to the suspension, stating to the Sheraton's General Manager that he did not understand and that it was unfair he was suspended for taking medical leave.

140. In response, Defendants' General Manager informed Mr. Aguirre that he was terminated.

141. The actual reason for Mr. Aguirre's termination was that he had exercised his right to take medical leave under the FMLA, and that he expressed opposition to Defendants' unlawful act of suspending him for taking medical leave.

142. Defendants violated the FMLA when they retaliated against Plaintiff by suspending him for taking medical leave and for terminating him because of his need for medical leave and/or because of his protected opposition to the suspension.

143. The unlawful employment practices complained of in the foregoing paragraphs were intentional, and/or were carried out with malice or reckless indifference to Mr. Aguirre's protected rights.

144. Defendants did not act in good faith when they terminated Mr. Aguirre and did not reasonably believe they were following the law.

145. As a direct and proximate cause of Defendants' interference described herein, Mr. Aguirre has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

### THIRD CLAIM FOR RELIEF
### Wrongful Discharge in Violation of Public Policy

146. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

147. Defendants terminated Mr. Aguirre in violation of public policy as set forth in numerous statutes, guidelines, regulations, and executive orders about or relating to COVID-19, including but not limited to the Healthy Families and Workplaces Act, C.R.S. §§ 8-13.3-401 *et seq.* (which prior to June 8, 2023 required employers to provide up to 80 hours of additional COVID-related paid sick leave), the United States Dep't of Health & Human Services' April 12, 2022 Public Health Emergency Determination, Colorado Department of Public Health & Environment's March 14, 2022 Fourteenth Amended Public Health Order 20-38, Colorado Executive Orders D 2022 002, D 2022 003, and D 2022 010, and other applicable statutes, codes,

orders, regulations, guidance, and other sources of public policy. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 104 (Colo. 1992); *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008); *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 524-25 (Colo. 1996).

148.   The Colorado Civil Rights Division has further specified that "[e]mployers are prohibited from discriminatory or unfair employment practices against employees who are showing symptoms of COVID-19 or who have been in contact with a known positive case of COVID-19. Discriminatory or unfair employment practices include a failure to hiere, discharge, promote or remote, harass or decisions related to compensation, terms, conditions or privileges of employment."

149.   Defendant's conduct described herein was attended by circumstances of fraud, malice, or willful and wanton conduct within the meaning of C.R.S. § 13-21-102.

150.   As a direct and proximate cause of Defendants' actions described herein, Mr. Aguirre has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in their favor, and against each Defendant, for the following relief:

a.   Actual economic damages as established at trial;

b.   Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

  c. Punitive damages for all claims as allowed by law in an amount to be determined at trial;

  d. Pre-judgment and post-judgment interest at the highest lawful rate;

  e. The appropriate tax-offset permitted by law;

  f. Attorneys' fees and costs; and

  g. Such further relief as justice requires, and any other relief as this court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted this 13th day of June, 2024.

               *s/ Benjamin DeGolia*

               Benjamin DeGolia
               DEGOLIA LAW P.C.
               2701 Lawrence St., Suite 116
               Denver, CO 80205
               (303) 210-3334 (t)
               (303) 210-0211 (f)
               benjamin@degolialaw.com